UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

EUGENE T. FULTON,

    Plaintiff,

v.

REBECCA IRENE VESSEL, L.L.C., a Washington limited liability company; and IQUIQUE U.S., L.L.C., a Washington for-profit limited liability company,

    Defendants.

CASE NO. C10-369RSM

MEMORANDUM AND DECISION

Plaintiff Eugene Fulton brings this seaman's injury action pursuant to the Jones Act, 46 U.S.C. § 30104, and general maritime law. He alleges that he was injured while working aboard the *F/T Rebecca Irene,* owned by defendant Rebecca Irene Vessel, L.L.C., while the vessel was on a fishing voyage in the Bering Sea. Defendant has denied liability for plaintiff's injuries.

This matter was tried to the Court in a three-day bench trial held June 27-30, 2011. The Court has fully considered the evidence presented, the exhibits admitted into evidence, and the argument of counsel, and being fully advised, now makes the following Findings of Fact and Conclusions of Law, and renders a decision.

## FINDINGS OF FACT

1. Eugene Fulton, age 36, is a resident of Sonora, California. He has a GED and has worked in construction (roofing) and other jobs. At age 24 he attended a seminar that motivated him to go into

MEMORANDUM AND DECISION - 1

commercial fishing. He started as a steward and worked his way up to processor and then to deckhand. Prior to working for defendant, plaintiff worked for *Nella Bella Joe*, a crab vessel, building nets and pots and setting net; for Kodiak Fish on board the *Legacy*; and for Fishing Company of Alaska, working on board the *Warrior* as a processor. Defendant's Exhibit 42.

2. *F/T Rebecca Irene* is a 140-foot factory trawler vessel. Plaintiff was employed as a deckhand on the ship in the winter of 2008, fishing in the Bering Sea for bottom fish. He was at all relevant times a seaman, as that term is defined by general maritime law and the Jones Act, employed in the services of the *F/T Rebecca Irene.* Captain Frances St. Croix, captain of the vessel at the time, has served as captain of the vessel for ten years, since August or September of 2001.

3. *F/T Rebecca Irene* fishes for bottom fish by dragging a net on the sea bottom. When the deckhands haul back the net, they may find discarded crab pots caught in the net, along with the fish. This is a fairly common occurrence in the Bering Sea fishery, and may occur five to ten times in one day. Crab pots vary in size but generally weigh about 700 to 800 pounds each.

4. When a crab pot is caught in the net, it must be cut away by the deckhands, and then is lifted by the crane operator from the trawl deck and moved to a place along the upper deck railing. A deckhand ties the crab pot to the outside of the rail, along with other crab pots that are similarly caught, until the vessel reaches a suitable place to dump them. The dumping places, often over a known wreck or other obstruction on the sea floor, are plotted on a map so they can be avoided when trawling.

5. On an unknown day in January or February 2008, plaintiff was working as a deckhand on board the *F/T Rebecca Irene*, along with deck boss Scott Knowlton and fellow deckhands Henry Laulu and Tui Saau. Mr. Laulu was operating the crane. Captain St. Croix was in the wheelhouse. A crab pot was caught in the net on the back haul and Captain St. Croix directed the crew to tie it on the starboard rail. Plaintiff and Mr. Knowlton went to the upper deck to tie up the crab pot while Mr. Laulu positioned it with the crane.

6. The upper deck area where the deckhands were tying up the crab pot to the rail is used to store mud gear. This is cable with black "rubber cookies" on it, stored in piles until needed. Plaintiff was standing partway up one pile of mud gear to reach the crab pot. The crab pot was swinging fore and aft

MEMORANDUM AND DECISION - 2

along the side of the vessel, outside of and below the rail, due to motion of the ship.  As plaintiff attempted to tie the crab pot, it lifted up and over the rail, swinging toward him.

7. Plaintiff testified that he jumped into a nearby burn basket (used to burn trash on the deck) to escape being hit, but found it too small to provide safety.  With the crab pot swinging toward him, he jumped down to the next deck below to escape.  Plaintiff tried to land on his feet but his legs gave out.  He felt a "little bit" of pain in his right knee and then, when asked by counsel to describe it, said he felt a sharp pain on the inner side.  Nevertheless, he got up and went back to work.  He did not fill out an injury report until February 15, 2008, when he left the vessel.  He testified that he did not realize that this was more than a minor incident until the beginning of the next trip.

8. Scott Knowlton testified that he had seen a crab pot swing while crewmen were tying it up before, but it was a rare occasion.  He stated that as plaintiff went up to tie off the crab pot, a large wave hit it and carried it up and over the rail.  With the crab pot swinging, Mr. Knowlton jumped behind a rail and hid.  He testified on direct that he saw plaintiff go over the rail, but he did not see him land on the deck below.   On cross examination, he testified that he did not actually see plaintiff go over the rail, but that he "knew he jumped."  Mr. Knowlton then went to look and saw plaintiff sitting on the lower deck.  After this, he observed plaintiff limping, and plaintiff told him that his knee hurt.  Mr. Knowlton was a fairly credible witness, but the conflict in his testimony between direct and cross, and his failure to explain how he "knew" plaintiff jumped, undermine his testimony with respect to that fact.

9. Captain St. Croix, who was in the wheelhouse during this incident, testified by deposition.  Although the exact date of the incident is unknown, he remembers the details because of what happened to plaintiff.  The seas were fairly heavy and the vessel was heading into the waves, or "pitching."  Captain St. Croix stated that he saw everything, beginning with the crab pot swinging fore and aft against the rail while plaintiff was partway up the mud gear tying it off.  Then he saw plaintiff dive into the burn basket, which Captain St. Croix described as having dimensions of 4 ½ feet by 4 ½ feet by 4 feet tall.   He did not know if the crab pot got hit by high seas, or what caused it to come over the rail and start swinging.  After plaintiff jumped or dove into the burn basket, the crew members "two blocked" the crab pot to the crane to stop it from swinging.  This action was described as taking up wire until the crab pot was at the top of the crane and could not swing any more. Captain St. Croix was not

MEMORANDUM AND DECISION - 3

one hundred percent sure this is what happened with the crab pot because he was watching plaintiff. He saw plaintiff come out of the burn basket and jump down to the lower deck, which was about eight feet below. He did not see how plaintiff landed on the deck below. Captain St. Croix further testified that if plaintiff had stayed in the burn basket another half minute, "we wouldn't be here," since he was safe there. After that landing, plaintiff returned to work.

   10.   Handling crab pots caught in the net was a common occurrence in the Bering Sea trawl fishery, and the procedure for handling them with the crane was the same for the twenty years Captain St. Croix had been fishing there. Prior to this incident, Captain St. Croix had seen many crab pots swing while being lashed to the rail, but this was the first time he had seen one come back aboard the vessel after being placed outside the rail. The Court finds Captain St. Croix was a highly credible witness.

   11.   Captain Charles Jacobsen testified as an expert witness on behalf of plaintiff. He had worked in the commercial fishing industry as a captain for thirty-seven years, nine of them on factory trawlers. The last year he worked on a factory trawler was 1999. Captain Jacobsen was familiar with the use of cranes to manage loads aboard such vessels, as well as safety standards found in the *Rebecca Irene's* safety manual and other safety manuals. He opined that a crane operator should maintain control of a load, not allowing it to swing from the crane on a long wire without a "tag line" to guide it. He also noted that the *Rebecca Irene* safety manual stated that loads should at no time be carried above people. He stated that on his vessel he did not allow loads to be lifted off the deck; they had to be dragged along. He acknowledged that in this case it was necessary to lift the crab pot out of the net in which it was entangled, but opined that it was not a good plan to move it when the wind was blowing 40 miles per hours because it was certain to go out of control. He further stated that it was unsafe to require a crewman to climb on mud gear stored on the deck while a crane was moving a load. He concluded that the crew of the *Rebecca Irene* had poor safety practices in this area, and that tolerance of swinging loads was the culture.

   12.   The Court finds that Captain Jacobsen was a credible expert witness, but his opinion regarding unsafe handling of the crab pot is based on facts that differ from the testimony given by the witnesses present on the vessel. There is no testimony that the crab pot was swinging when it was lifted from the net, or that it was lifted over the crew members. The testimony was that the crab pot was

MEMORANDUM AND DECISION - 4

sliding or swinging fore and aft against the vessel, outside of and below the rail, when the crane operator "wired down" to place the pot in position to be tied to the rail.  It was not until it was lifted up by a wave, and came back over the rail, that it started swinging on the wire.  Specifically, Scott Knowlton testified that when the wave hit the pot, it started to swing.  Deposition of Scott Knowlton, pl. 13 lines 21-23.  The Court cannot credit Captain Jacobsen's conclusions about unsafe conditions aboard the *F/V Rebecca Irene* on the day of this incident.

13.  Because plaintiff did not file an injury report on the date of the incident, there is no record of the date this crab pot incident occurred.  Therefore there is no record of how much time passed between that date and the date plaintiff filled out the injury report, February 15, 2008.  There is also no way to determine what the weather and condition of the seas actually were on that day.  Captain St. Croix described the weather on the day of the incident as "pretty [bad]" and estimated the windspeed at 40 to 50 miles per hour.

14.  Plaintiff left the *Rebecca Irene* on February 15, 2008 and saw a doctor in Unalaska that day.  An x-ray did not show any signs of fracture.  The doctor noted "non-bony pain [with] slight medial edema" in plaintiff's knee.  Plaintiff's Exhibit 11.  He diagnosed a "sprain" and recommended physical therapy two to three times a week, rest, and an MRI if not improved.  *Id.*  The doctor also prescribed Vicodin for pain at night.

15.  Plaintiff testified that "the office" decided he should return to Seattle for further diagnosis.  He went to Northwest Orthopedic Clinic on February 19, 2008 for an examination and MRI.  The MRI revealed a "nondisplaced horizontal cleavage tear" of the medial meniscus.  Plaintiff's Exhibit 12.  Allen Jackson, M.D. recommended that plaintiff return to California for treatment, which would likely include arthroscopic partial menisectomy.  *Id*.  This recommendation was reported to Polaris Group.  *Id*.

16.  Plaintiff was evaluated by Gary Murata, M.D. at the Alpine Orthopaedic Medical Clinic in Stockton, California on March 8, 2008.  Dr. Murata reviewed the previous MRI and examined plaintiff.  He recommended arthroscopic surgery on the right knee as soon as possible.  Plaintiff's Exhibit 13.  He opined that plaintiff would be able to work as a fisherman four weeks after surgery.  He renewed plaintiff's Vicodin prescription.  *Id*.

17.  Plaintiff had arthroscopic surgery on the right knee on March 13, 2008.  Plaintiff's Exhibit

MEMORANDUM AND DECISION - 5

14.  The surgery was performed by Frank Whitney, M.D. at the Sonora Surgery Center.  *Id*.  Dr. Whitney provided plaintiff's follow-up care and noted two weeks after surgery that plaintiff was "doing extremely well" but "still has a little soreness."  Plaintiff's Exhibit 15.  He recommended a home exercise program and noted that plaintiff could return to work on April 1, 2008.  *Id*.

18.  Plaintiff returned to work on the *F/T Rebecca Irene* from April 6, 2008 to May 24, 2008.  Plaintiff's Exhibit 24.  His signed "end of voyage" statement states that he was not injured on this trip.  *Id*.  Plaintiff testified that with respect to his knee, it felt all right in the beginning, but after some of the long shifts he started feeling some pain.

19.  Plaintiff returned to see Dr. Whitney in Sonora on June 3, 2008 and June 12, 2008.  Plaintiff's Exhibit 15.  Plaintiff reported continued pain in his knee, which was worse with prolonged weight bearing and twisting.  *Id*.  Dr. Whitney noted Grade 3 signal changes in one section of the medial meniscus, but not adjacent areas.  His impression on the etiology of the pain was possibly "focal overload secondary to loss of the weight bearing cushion of the medial meniscus."  *Id.,* p. 4.  Dr. Whitney recommended that plaintiff should remain as active as possible, avoiding impact activities like jogging and gravitating toward swimming and cycling instead.  He also recommended a knee wrap for support and over-the-counter anti-inflammatories such as ibuprofen.  *Id*., p. 5.

20.  Plaintiff returned to Alaska to work on the catcher/processor *Vaerdal*, owned by Jubilee Fisheries, on numerous voyages from July 2008 to October 2008.  Defendant's Exhibits 65, 66.  Plaintiff testified very little about his work aboard the *Vaerdal* on direct; he stated only that his right knee did not bother him at first, but as time went on his knee hurt.  He iced it every night and was still able to work.  He injured his left knee aboard the *Vaerdal* when he stepped into a pocket and twisted it.

21.  Plaintiff returned to Dr. Whitney on November 13, 2008 for evaluation of his new injury to the left knee as well as continued pain in his right knee.  Plaintiff's Exhibit 15, p. 6.  Plaintiff reported to Dr. Whitney that he did not feel safe working on the fishing boat with an unstable knee.  Dr. Whitney suspected a medial meniscus tear of the left knee and ordered an MRI.  On November 26, 2008 he reviewed the MRI which confirmed his suspicion, and recommended arthroscopic surgery.  Due to plaintiff's continued pain in the right knee, Dr. Whitney also recommended a repeat diagnostic arthroscopy of the right knee, to be done at the same time.  Plaintiff's Exhibit 15, pp. 8-10.

MEMORANDUM AND DECISION - 6

22. Plaintiff had arthroscopic surgery on both knees on December 4, 2008. On the right knee, a large synovial shelf plica was removed. On the left, a medial meniscus tear was repaired. Plaintiff's Exhibit 15, pp. 11-11-14. On December 10, 2008, Dr. Whitney saw plaintiff for followup, and reported that the right knee looked excellent with minimal effusion, and that plaintiff thought it felt better. *Id*., pp. 11-12. He recommended a gradual increase in activity and an exercise program including straight-leg raises, walking and cycling. *Id*. Plaintiff did not testify regarding his compliance with this recommendation. He returned to see Dr. Whitney on December 31, 2008. Dr. Whitney noted that the right knee appeared normal for one month after surgery, showed no instability, and that plaintiff had full range of motion from full extension to 135 degrees of flexion. *Id*., pp. 15-16. He also noted that plaintiff still had some aching and swelling, but that the knee felt better than it did before the operation. *Id.* He released plaintiff to work as of January 2, 2009, "with limitation" as to the right knee and "without limitation" as to the left, instructed him in an appropriate exercise regimen for rehabilitation, and recommended Aleve or Advil for pain. *Id*., p. 16., 18. On January 20, 2009, Dr. Whitney responded to a letter from Jubilee Fisheries, plaintiff's last 2008 employer, stating that plaintiff was expected by that time to have reached normal work capacity "with respect to his peers" and that he was released for duty without restrictions as of January 20, 2009. Plaintiff's Exhibit 15, p. 19.

23. Plaintiff testified that he flew to Seattle to go to work, but that he and "the office" decided he needed more time off. He returned to California. Dr. Whitney saw plaintiff on February 11, 2009 and made a report to the State of California Department of Worker's Compensation. Plaintiff's Exhibit 15, p. 21. He stated that plaintiff's knee "appears excellent" and that he had full range of motion from full extension to 140 degrees flexion. He found no tenderness on palpation of areas that previously were tender. *Id*. He wrote, "He denies any significant pain in his right knee. He also states that he has returned to his normal level of function, and is not taking any medication in order to facilitate his function." *Id*. Dr. Whitney recommended that plaintiff be cleared for return to his usual work, commercial fishing. He noted that plaintiff had made excellent recovery and met all objective and subjective parameters for return to normal function. He stated that there was no plan for further treatment, and that plaintiff was encouraged to maintain maximum strength and physical fitness to help avoid further injury. *Id*., p. 16. The Court finds that this report and recommendation was a definitive

MEMORANDUM AND DECISION - 7

statement of Dr. Whitney's opinion, as treating physician, that plaintiff was fully recovered and ready to return to his work in Alaska.

24. On June 28, 2009, plaintiff applied for work with U.S. Seafoods. Defendant's Exhibit 38. The health form he filled out noted knee pain in 2008 and that he continued to wear a knee brace, but he denied any joint trouble. *Id.,* p. 28. He testified at his deposition that he regarded himself as fit to perform the duties of a deckhand in the Bering Sea, and that he so represented himself in the application. Deposition of Eugene Fulton, March 3, 2010, p. 10. Plaintiff made ten voyages with U.S. Seafoods that season, starting June 30, 2009 and ending October 27, 2009. *Id.*, p. 1. Plaintiff testified at trial that his knee hurt most of that time, and he iced it every night in his room. Nevertheless, he believed at that time he could continue working as a deckhand in the next season (2010), and he went home to get ready for the "A" season.

25. Plaintiff testified on direct that he did not believe it was possible for him to return to work in 2010. However, he testified upon cross-examination that he applied for work in Alaska in January and February 2010, again representing to the potential employers that he was fully fit for work. When questioned about this, he replied that his knee was feeling better at that time, and he needed money. This cross-examination was based on plaintiff's March 3, 2010 deposition testimony that he applied to "O'Hara, U.S. Seafoods, Jubilee Fisheries, Trident, and Cascade." Deposition of Eugene Fulton, March 3, 2010, p. 22. He did not recall identifying any restrictions in his ability to work on any of these applications. *Id.*, pp. 48-49. Plaintiff did not get any calls back from any of these companies, and he was not hired by any of them. *Id.*, p. 23. Plaintiff also applied around this time for an Able Bodied Seaman card. He submitted to a coast Guard physical examination and drug test, and represented himself as fully fit for duty at that time. The results of the physical and drug test were not made available to defendant and were addressed on cross-examination, as set forth below.

26. This lawsuit was filed on March 5, 2010, two days after the March 3, 2010 deposition. Plaintiff did not return to see Dr. Whitney until March 9, 2010, six days after the deposition. This was the first time he had seen Dr. Whitney since February 11, 2009, and the first time since he returned from fishing with U.S. Seafoods in late 2009. Dr. Whitney did not make any new findings but noted that plaintiff reported that his knee "continued to be painful," although he had not yet "started the season."

MEMORANDUM AND DECISION - 8

Plaintiff's Exhibit 38, p. 24.  It is significant that this visit to Dr. Whitney occurred after plaintiff unsuccessfully tried to get a job fishing with various companies, representing to each that he was fit to work.  *See*, Finding of Fact ¶ 24.

27.  Dr. Whitney recommended on March 9, 2010 that plaintiff delay his fishing season and pursue treatment.  He advised physical therapy to strengthen his quad and patellofemoral joint, OTC anti-inflammatories such as ibuprofen, a knee sleeve such as plaintiff was currently using, and no "high-risk" activities.  He asked that plaintiff return for a re-check in one month.  Plaintiff's Exhibit 15, p. 25.  Plaintiff did not return to Dr. Whitney until more than three months later, June 30, 2010.  *Id*., p. 26.  Noting that plaintiff has had a "colorful history," Dr. Whitney reported that plaintiff "states he continues to have discomfort in the knee," mainly "aching discomfort," and that "most recently he is starting to get a feeling that it is giving out."  *Id.*, p. 26.  Although plaintiff testified at length during trial that this "giving out" feeling made him feel unsafe while working as a deckhand, this was the first time he mentioned this sensation to Dr Whitney; prior to this date (June 30, 2010), his complaint was "aching discomfort" and some swelling.

28.  On cross-examination, plaintiff testified that he used Vicodin for pain at night when he worked for U.S. Seafoods on the *Ocean Alaska* in July through October of 2009.  He admitted that he carried the Vicodin pills on board without disclosing them to his employer, in violation of company policy.  *See*, Defendant's Exhibit 38, pp. 3-4.  Plaintiff stated he did not know this was a violation, although he signed the policy statement, acknowledging that he had read it.  He testified that he only took one pill each night, but then stated he had approximately fifty pills for this four-month period.  He testified that Dr. Whitney prescribed them, but could not recall the date.  When advised that Dr. Whitney testified in his deposition that he prescribed 30 tablets of narcotic pain relievers after the December 2008 surgery, and then no more narcotic pain relievers until sometime in 2010, plaintiff could not explain where he obtained the fifty Vicodin pills that he took on board the *Ocean Alaska*.

29.  Plaintiff was questioned further on cross-examination about his use of narcotic pain relievers in 2010.  Records from CVS Pharmacy show that plaintiff obtained sixty hydrocodone pills approximately every ten days from July 18, 2010 to December 11, 2010, a total of thirteen times.  Plaintiff's Exhibit 21.  Each of the prescriptions was filled with Dr. Whitney listed as the prescriber.  Dr.

MEMORANDUM AND DECISION - 9

Whitney did testify that he wrote one prescription for narcotic pain relievers in June of 2010 and one in July of 2010. Deposition of Frank Whitney, M.D., December 6, 2010, p. 60. The June prescription was filled at Wal-Mart, before plaintiff started going to CVS. Defendant's Exhibit 76, p. 2. Dr. Whitney retired in September 2010, and the refill requests that were sent to his office on September 9, 2010 and September 19, 2010 from CVS have a hand-written note of "no further refills." Defendant's Exhibit 78, pp. 13-14. Nevertheless plaintiff refilled the prescription six times after that. Plaintiff testified that CVS then informed him he needed to see a new doctor. He saw John Krpan, D.O. at Forest Road Prompt Care for knee pain on January 22, 2011 and was advised make an appointment to see Dr. Mers for care. Dr. Krpan prescribed forty pills of hydrocodone and plaintiff filled the prescription at CVS that day. Plaintiff's Exhibit 21. On February 1, 2011 plaintiff returned to Forest Road Prompt Care with his complaint of knee pain. He saw Anne Braunstein, M.D. The notes from this visit indicate that plaintiff had an appointment to see Dr. Mers on February 3 but was returning to Alaska and needed more pain medication. The examining physician noted a concern that plaintiff was using PromptCare to be his "narcotic supplier. " Defendant's Exhibit 77, p. 15. Dr. Braunstein prescribed twenty pills of hydrocodone to last him until he could see Dr. Mers. *Id*. Plaintiff refilled the prescription that day at CVS. This was the last hydrocodone prescription plaintiff filled at CVS. Plaintiff's Exhibit 21. There are no records of a visit to see Dr. Mers.

      30. Plaintiff was also questioned on cross-examination regarding the results of a drug test he took early in 2010 for a Coast Guard physical when he was applying for an "able bodied seaman" card. Plaintiff represented to counsel at his February 28, 2010 deposition, and the followup deposition on March 3, that the physical and drug test results were probably in a box at his house. Plaintiff was asked at the deposition to find the paperwork. On cross-examination he was asked why he had not found the paperwork and he responded that ninety percent of the house was packed up in boxes; he had searched a few of them but not all. This answer, given in June 2011, fails to explain his failure to look for or find the test results after they were requested at the February 27, 2010 deposition, fourteen months earlier. Further, plaintiff could not remember the name of the walk-up clinic where he had the exam and drug test, or the name of the doctor. Yet he testified that he had recently called the doctor to request the

MEMORANDUM AND DECISION - 10

records and they had exchanged voice messages, but he could not recall when that occurred. When asked for the phone number so counsel could follow up, plaintiff stated he did not have it with him.

31. Plaintiff's credibility was seriously undermined on cross-examination by his evasive answers, his frequent lack of recall, and by the totality of the circumstances demonstrated by his testimony regarding use of Vicodin on the *Ocean Alaska* in violation of company policy, and the pharmacy records indicating frequent and numerous refills for a narcotic pain reliever at a time when plaintiff was not under the care of any doctor. The Court finds that plaintiff was not an entirely credible witness.

32. Orthopedic surgeon Eugene Toomey, M.D., testified as an expert for defendant. Dr. Toomey examined plaintiff in May of 2010, and also reviewed Dr. Whitney's records. Dr. Toomey testified that at that time plaintiff told him he was taking Norco, a high-dose narcotic pain reliever, four times daily, since November 2009. This report is significant in light of Dr. Whitney's testimony and records demonstrating that he did not prescribe any narcotic pain relievers for plaintiff between December 2008 and June 2010. Dr. Toomey noted that this level of narcotic use over six months was a matter of significant concern. On examination, he could not find any pathology in terms of lack of range of motion or swelling, only mild pain around the kneecap. X-rays of the knee were completely normal and did not show any arthritis. He pointed to the same findings in Dr. Whitney's notes, including the full range of motion to 140 degrees of flexion. He demonstrated the absence of abnormality in plaintiff's x-rays. He concluded with an opinion, to a reasonable degree of medical probability, that plaintiff had reached maximum medical improvement in his right knee following the two arthroscopic surgeries. He could not find any pathology that would require further treatment. The Court finds Dr. Toomey a highly credible witness.

33. Theodore Becker, Ph.D., testified as an expert for plaintiff. Dr. Becker holds an undergraduate degree in physical therapy, a master's degree in sports science and sports medicine, and a doctorate in human performance. He has taught in the fields of human performance and biomechanics. Dr. Becker tested and evaluated plaintiff on January 25, 2010, using tests and specialized equipment developed for his field. Dr. Becker found measurable atrophy of plaintiff's right leg, together with measurable swelling of 0.4 centimeters after exercise. He noted a fifty-one percent deficit in flexion of

MEMORANDUM AND DECISION - 11

the right knee. He found unevenness in plaintiff's stance and gait, which he demonstrated to the Court with photographs. He credited plaintiff's report of a locking knee or a knee that "gives way" in forming his opinion regarding plaintiff's ability to work. His opinion was that plaintiff could work an eight-hour day, but that he would need accommodations and adaptation. He limited plaintiff's standing and walking to 320 minutes of a 480-minute day. Lifting and carrying would be limited by the length of time he could stand in an upright position. Using a Dictionary of Occupational titles, he limited plaintiff to "medium" work, with accommodations. He described a "derotational brace" as one type of accommodation. The Court considers Dr. Becker a credible witness but cannot fully credit his opinion that plaintiff is only capable of "medium" work. Dr. Becker stated that his evaluation was based on an interview and physical testing of plaintiff. He did not state that he reviewed the medical records and did not, as far as the testimony went, have the benefit of Dr. Whitney's February 11, 2009 record stating that plaintiff was in effect fully recovered. Nor was he aware of the history of narcotic drug use; yet according to Dr. Toomey plaintiff was taking four Narco pills a day at the time he was evaluated by Dr. Becker. Further, Dr. Becker admitted there is a subjective component in the testing with respect to whether a person is exerting maximum effort. Finally, Dr. Becker is an expert in biomechanics but is not a medical doctor. To the extent that his opinions differ from that of Dr. Toomey or Dr. Whitney, the Court will credit the latter.

CONCLUSIONS OF LAW

Having found these facts from the evidence presented, the Court now makes the following Conclusions of Law:

1. Plaintiff filed this suit pursuant to the Jones Act, 46 U.S.C. § 30104, as amended October 2006, and general maritime law. The Court has jurisdiction of the matter pursuant to 28 U.S.C. § 1331. Venue is proper in this district due to defendant's presence here. The vessel *F/T Rebecca Irene* was owned by defendant, who is a resident of this district.

2. The Jones Act, originally enacted as 46 U.S.C. § 688, provides that "a seaman injured in the course of his employment . . . may elect to bring a civil action at law, with the right of trial by jury,

MEMORANDUM AND DECISION - 12

against the employer. Laws of the United Stated regulating recovery for personal injury to, or death of, a railway employees apply to an action under this section. 46 U.S.C.§ 30104(a).

3.  Plaintiff was a seaman within the meaning of the Jones Act in January and February of 2008.

4.  In order to prevail on his negligence claim under the Jones Act, plaintiff has the burden of proving, by a preponderance of the evidence, that the defendant was negligent, and that such negligence was the cause, however slight, of his injury. *In re Hechinger*, 890 F. 2d 202, 208 (9th Cir. 1989); *cert. denied*, 498 U.S. 848 (1990).

5.  The Court finds that plaintiff has not met his burden of proving, by a preponderance of the evidence, that the defendant was negligent. The procedures used aboard the *F/T Rebecca Irene* for handling the crab pot were consistent with practice throughout the trawling industry and were safe under usual conditions, including heavy seas or winds of forty miles per hour. The wave that lifted the crab pot up and carried it over the rail, causing it to swing toward plaintiff, was a highly unusual and unforeseen event over which defendant had no control. As such, it was a "peril of the sea" against which ordinary care and prudence cannot guard. *Ferrara v. A&V Fishing, Inc.*, 99 F. 3d 449, 454 (1st Cir. 1996) (addressing "peril of the sea" in the context of unseaworthiness). Where the cause of the accident was an act of God or peril of the sea, there can be no finding of negligence. *In re Hechinger*, 890 F. 2d at 209.

6.  Plaintiff's expert, Captain Jacobsen, did not adequately address the factual scenario here, where a large wave hit the crab pot and lifted it, and thus did not establish that proposed safety measures, such as tag lines, could have prevented the pot from swinging toward plaintiff. Further, Captain Jacobsen did not present testimony to counter Captain St. Croix's opinion that plaintiff could safely have remained in the burn basket instead of jumping to the deck below. Thus plaintiff has presented no evidence, apart from his own statement which the Court does not fully credit, to rebut the inference that he was himself negligent in jumping to the deck below instead of remaining in a place where he was safe.

7.  In order to prevail on his claim of unseaworthiness under the Jones Act, plaintiff has the burden of proving by a preponderance of the evidence that the *F/T Rebecca Irene* was unseaworthy, and that the unseaworthy condition was a cause of his injury. A vessel is seaworthy if the vessel and its

MEMORANDUM AND DECISION - 13

parts and equipment are reasonably fit for their intended purpose, and operated by a crew which is reasonably adequate and competent for the work assigned. Conversely, the vessel is unseaworthy if the vessel or any of its equipment is not reasonably fit for its intended purpose, or if its crew is not reasonably adequate or competent to perform the work assigned. *Ribitzki v. Canmar Reading & Bates, Ltd. Partnership*, 111 F. 3d 658, 664 (9th Cir. 1997).

8. A vessel owner has a duty to provide adequate safety equipment for the vessel. However, the vessel owner is not required to furnish an accident-free ship. The vessel owner is not required to have the best parts and equipment, nor the finest of crews; it is required to have what is reasonably proper and suitable for its intended use. *Mitchell v. Trawler Racer*, 362 U.S. 539, 550 (1960); *Lee v. Pacific Far East Line*, 566 F. 2d 65, 67 (9th Cir. 1977).

9. Unseaworthness is a cause of injury if it played a substantial part in bringing about injury to the plaintiff. *Ribitzki*, 111 F. 3d at 665. This is a different standard than the negligence standard.

10. The Court finds that plaintiff has failed to meet his burden of demonstrating, by a preponderance of the evidence, that there was an unseaworthy condition on the *F/T Rebecca Irene*. The Court has already found that the wave that lifted up the crab pot and carried it back over the rail was a rare and unforeseen event, a peril of the sea. Plaintiff produced no evidence that anyone else had ever been injured by a crab pot in this way, despite the very large number of crab pots that are caught and stowed by trawlers every day. Captain St. Croix, whom the Court has found highly credible, had never seen this happen in all the years he had been working on fishing boats and trawlers. The Court concludes, as a matter of law, that the crab pot which came back over the rail did not represent an unseaworthy condition on the *F/T Rebecca Irene* in January or February 2008.

11. The medical record establishes that plaintiff was fit for duty and his knee recovered from injury at the time of Dr. Whitney's examination on February 11, 2009, at the latest. Plaintiff's subjective reports of knee pain after that date, severe enough to prevent him from working, are unsupported by contemporaneous medical findings, and are contradicted by his continuing to work in 2009 and to apply for work in early 2010, representing himself as fit for duty. It appears his continued reports of knee pain were motivated at least in part by a desire to obtain narcotic pain medication.

MEMORANDUM AND DECISION - 14

12. Defendant is entitled, under Fed.R.Civ.P. 41(d), to recover costs incurred in defending plaintiff's previously-dismissed state court action.

### DECISION OF THE COURT

Plaintiff has failed to meet his burden of proof on his claims of negligence and unseaworthiness. The Court finds in favor of defendant on all plaintiff's claims in this matter. The Clerk shall enter judgment accordingly.

Dated this 25 day of October 2011.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE

MEMORANDUM AND DECISION - 15